**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

DEBRA A. KORNACKI,

                     Plaintiff,

-vs-                                           Case No. 3:14-cv-784-J-34MCR

SOUTHERN FARM BUREAU LIFE
INSURANCE COMPANY,

                     Defendant.

_____/

## O R D E R

**THIS CAUSE** is before the Court on Southern Farm Bureau Life Insurance

Company's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc.

No. 21; Motion), filed on June 11, 2015.[1] On July 2, 2015, Plaintiff, Debra Kornacki, filed

Plaintiff's Response to Defendant's Motion for Summary Judgment and Incorporated

Memorandum of Law (Doc. No. 33; Response).[2] With the Court's leave, see Doc. No. 37,

---

[1] In support of the Motion, SFBLIC submits the depositions of Jennifer Sheffield (Doc. No. 23-1; Sheffield Depo.), Brad Raulerson (Doc. No. 24-1; Raulerson Depo.), Debra Kornacki (Doc. No. 25-1; Kornacki Depo.), Laura Humphries (Doc. No. 26-1; Humphries Depo.), Todd Gicalone (Doc. No. 27-1; Gicalone Depo.), and Dean Woehrle (Doc. No. 28-1; Woehrle Depo.); an affidavit from Raulerson (Doc. No. 29; Raulerson Aff.) with an attachment containing all e-mail correspondence between Raulerson and Dr. Kerry Kornacki (Doc. No. 29-1; Raulerson E-mails); and its first and second requests for admissions and their attachments, as well as Mrs. Kornacki's responses to that discovery (Doc. Nos. 30-1–30-4). Deposition page citations correspond to the page numbers on the CM/ECF documents.

[2] In support of the Response, Mrs. Kornacki submits excerpts from the depositions of Dana Bell (Doc. No. 33-1) and Debra Rochester (Doc. No. 33-4); an e-mail from SFBLIC's counsel (Doc. No. 33-2); SFBLIC's response to Mrs. Kornacki's request for production of documents (Doc. No. 33-3); copies of envelopes and the materials enclosed therein that were sent from the Nassau County Farm Bureau to SFBLIC on the Kornackis' behalf (Doc. No. 33-13); a screenshot of the Nassau County Farm Bureau website (Doc. No. 33-6); a statement from Mrs. and Dr. Kornacki's Wells Fargo accounts from March and April 2012 (Doc. No. 33-14); a copy of Raulerson's business card (Doc. No. 33-8); a January 2012 letter from Defendant to Dr. Kornacki (Doc. No. 33-9); a statement from Mrs. and Dr. Kornacki's Wells Fargo accounts from September 2012 (Doc. No. 33-15); affidavits of Rochester and Bell (Doc. No. 33-11); and a September 26, 2012, call log reflecting a call between SFBLIC's Home Office and Raulerson (Doc. No. 33-12). Although not submitted with her Response, Mrs. Kornacki later filed the full deposition of Rochester

Defendant filed Southern Farm Bureau Life Insurance Company's Reply Memorandum on July 20, 2015 (Doc. No. 38; Reply),[3] and Plaintiff filed Plaintiff's Surreply in Opposition to Southern Farm Bureau Life Insurance Company's Motion for Summary Judgment on July 30, 2015 (Doc. No. 40; Surreply). Accordingly, this matter is ripe for review.

## I.  Background[4]

On June 10, 2005, at age 45, Dr. Kerry Kornacki completed an Application for Insurance to obtain life insurance. Woehrle Depo. at 150–56. Dr. Kornacki's friend, Dean Woehrle, sold him the policy. Woehrle Depo. at 16. On July 24, 2005, Defendant, Southern Farm Bureau Life Insurance Company ("SFBLIC"), issued a 20-year Non-Participating Renewable and Convertible Term Insurance Policy, Policy No. 015941083L, to Dr. Kornacki with a $500,000 death benefit, naming Plaintiff, Debra Kornacki, Dr. Kornacki's wife, as the sole beneficiary. Doc. No. 5-1; Policy. The Application and Policy together formed "the entire contract of insurance." Woehrle Depo. at 156; Policy at 8.

The Policy stated:

> All premiums are due and payable in advance at Our Home Office [defined as SFBLIC's principal office in Jackson, Mississippi]…. Premiums may be paid: (a) annually (once a year); or (b) semiannually (twice a year). With Our consent, You may change the method of payment on any premium due date.

---

with her motion in limine, see Doc. No. 47-1 (Rochester Depo.), and, at the Court's direction, see Doc. No. 50, the full deposition of Bell, see Doc. No. 51-1 (Bell Depo.).

[3] In support of the Reply, SFBLIC submits excerpts from the transcripts of Bell's, Rochester's, Gicalone's, and Woehrle's depositions (Doc. Nos. 38-1–38-4) and a schedule showing premium amounts for the Policy based on the mode of payment (Doc. No. 38-5).

[4] Unless otherwise noted, the facts recited herein are undisputed based on the information provided by the parties. For the purposes of resolving SFBLIC's Motion, the Court views all disputed facts and reasonable inferences in the light most favorable to Mrs. Kornacki. The Court notes that these facts may differ from those ultimately proved at trial.  See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

Policy at 4. In the Application, SFBLIC provided the additional option of automatic monthly payments, including by electronic funds transfer (EFT). Woehrle Depo. at 153. Dr. Kornacki chose to pay his premium through automatic monthly EFT payments of $144.32. Id.; see Doc. No. 38-5. With regard to the payment of premiums, the Policy stated:

> A grace period of 31 days will be allowed for the payment of each premium after the first. This policy will continue in force during the grace period. If any premium due remains unpaid at the end of the grace period, this policy will lapse as of that premium's due date.

Policy at 4.

In December 2011, an automatic EFT draft for Dr. Kornacki's monthly premium failed because the account Dr. Kornacki had linked to the payment had been closed. Humphries Depo. at 7. On December 8, 2011, Dr. Kornacki completed a new Authorization Agreement for Preauthorized Payments (Authorization Agreement) changing the bank account linked to his automatic EFT payment to a Wells Fargo account. Doc. No. 33-13 at 5. In a box on the Authorization Agreement titled "Authorization to Honor ACH Debit Entries or Drafts Drawn by Southern Farm Bureau Life Insurance Company, Jackson, Mississippi," the Authorization Agreement states:

> To: Wells Fargo Bank … As a convenience to me, I hereby request and authorize you to pay and charge to my account debit entries or drafts drawn on my account and payable to the order of Southern Farm Bureau Life Insurance Company …. This authority is to remain in effect until revoked by me in writing, and until you actually receive such notice I agree that you shall be protected in honoring any such debit entry or draft.

Doc. No. 33-13 at 5. That same day, Dr. Kornacki tendered a check for $144.32 (one month's premium) signed by Mrs. Kornacki, along with a voided check. Doc. No. 33-13 at 3, 7. Someone at the Nassau County Farm Bureau forwarded all three documents to SFBLIC. Doc. No. 33-13 at 2, 4, 8.

Woehrle retired in late 2011. Woehrle Depo. at 17. On January 25, 2012, SFBLIC

introduced Charles Brad Raulerson as Dr. Kornacki's "new servicing agent" in Callahan,

Florida. Doc. No. 33-9 at 2. On August 10, 2012, following telephone conversations, see

Raulerson Depo. at 57–58, Raulerson e-mailed Dr. Kornacki, stating:

> I have attached a copy of an in force illustration for your life insurance. I
> have also attached a proposal for converting a portion of the term into
> permanent insurance. Please review and let me know if you have any
> questions. I will follow up in a few days.

Raulerson E-mails at 2. On August 11, 2012 (a Saturday), Dr. Kornacki responded, "AM

I CURRENT? DR K." Raulerson E-mails at 2. Raulerson did not reply to that e-mail. See

generally Raulerson E-mails. On August 13, 2012, Dr. Kornacki separately replied to

Raulerson's August 10 e-mail, stating:

> Thank you for the information that you have sent. What I really need to know
> is under what circumstances will my current term life insurance policy fail to
> pay full survivor's benefits. Acts of war, etc[.], everything. I also need to
> speak with you tomorrow regarding my upcoming premium payment
> scheduled for what I think is the 18th of August. I'll be at the office after 10
> AM …. If I don't hear from you by noon, I'll attempt to call you. I'm just at an
> age when one begins to really be concerned with such matters. I trust you
> can help.

Raulerson E-mails at 3. Raulerson responded the next morning, August 14, 2012, at 9:48

a.m., stating:

> I am going to be on a conference call at 10 a.m. It might last an hour – not
> sure? Let me know when a good time to call will be. If you would prefer,
> maybe we can set up a time for you to come in at the office or I could drop
> by your office to go over your concerns. Let me know what works for you.

Raulerson E-mails at 3.

According to Raulerson, he then spoke to Dr. Kornacki on the telephone sometime

that morning, and Dr. Kornacki instructed Raulerson to cancel the automatic EFT

payment. Motion at 3–4. Raulerson testified that Dr. Kornacki told him he did not think he

had sufficient money in his account to cover the automatic payment but that he expected some money in the next 7 to 10 days. Raulerson Depo. at 76–79. Raulerson further testified that he initially instructed Dr. Kornacki to contact the Home Office to cancel the automatic payment and then call them back to reinstate it after Dr. Kornacki received the money he was expecting, but Dr. Kornacki asked if Raulerson could cancel it for him. Raulerson Depo. at 79. Raulerson agreed to do so but cautioned Dr. Kornacki that he would need to contact the Home Office later to reinstate the automatic payment. Id. Raulerson testified that Dr. Kornacki never asked him to reinstate the automatic payment. Id. Mrs. Kornacki contends no such telephone conversation took place. Response at 2–3, 7.

Bank records show the Wells Fargo account linked to the automatic EFT payment had a balance of -$483.13 on August 9, 2012, and -$597.94 on August 14, 2012. Kornacki Depo. at 134. On August 16, 2012, Dr. Kornacki deposited $23,500 which he received from selling a car into that account. Kornacki Depo. at 38–39, 134.

At 10:42 a.m. on August 14, 2012, Raulerson called the Home Office to cancel Dr. Kornacki's automatic EFT payment. Raulerson Depo. at 76. Raulerson and the operator had the following recorded exchange:

> BRAD RAULERSON: … He [Dr. Kornacki] was wandering [sic] if we could suspend his draft and he's gonna wants [sic] to pick it up you know in maybe a week or two later.
>
> [OPERATOR:] Ok Sure, sure. Do we want to place on annual or semi-annual or does it matter.
>
> BRAD RAULERSON: Just Semi-annual. But I gotta [sic] feeling that he's we [sic] should be calling back in a few day [sic] in a week or two and putting it back on but.

> OPERATOR: Ok ok that's no problem I just have to change it to that temporarily you know for now in order to stop the draft.
>
> BRAD RAULERSON: Ok
>
> …
>
> OPERATOR: Ok I see that draft is coming up for tomorrow so we can stop that so it will not go out tomorrow night
>
> BRAD RAULERSON: Ok
>
> …
>
> OPERATOR: Alright then I do have that changed. Now if you would give the client a heads up and let them know that this is going to generate a premium notice to go out for now, but simply because we had to change the mode in order to stop that draft tomorrow. But as soon as the client lets us know we'll resume it and then that will go away it will go back on bank draft ok[.]

Doc. No. 20-2 at 2.

On August 24, 2012, SFBLIC prepared a Notice of Premium Due identifying the billing mode for Dr. Kornacki's policy as semiannual and stating that the $725.42 premium was due that day. Doc. No. 30-1 at 4. SFBLIC mailed the notice to Dr. Kornacki on August 29, 2012. Kornacki Depo. at 93.  Mrs. Kornacki acknowledges that Dr. Kornacki received that notice and that it required him to pay the full amount by the due date to maintain coverage in force. Doc. No. 30-2 at 1.

On September 7, 2012, Dr. Kornacki e-mailed Raulerson about the semiannual-premium notice:

> Dear Brad, I received my latest FB [Farm Bureau] invoice, dated 8-24-2 [sic] in the mail asking me to pay $725.42 towards my term life insurance. This amount is simply not in my budget at this time. Write me back and advise me if I can remit 2 months [sic] premiums at this time. I've had this coverage for a long time, and although it's not an especially competitive rate, I bought it from Dean Woehrle as we are close friends. I hate to lose it or to go to another company. I look forward to hearing from you.

Raulerson E-mails at 4. On September 10, 2012, Raulerson responded:

> You can call the life insurance company … and ask for the billing department and they can put you back on bank draft and your monthly payments will be $144.32. The bill you received was a pro-rated semi-annual payment. Let me know if you have any more questions?

Raulerson E-mails at 4. Later that day, Dr. Kornacki replied, "Thanks Brad, I just want to get it current right now, My Obama bailout money never showed up!," to which Raulerson responded, "I am still looking for mine too." Raulerson E-mails at 4. Raulerson and Dr. Kornacki had no further e-mail communication. See Raulerson Aff. at 2 (affidavit of Raulerson stating attached e-mails are the only ones between him and Dr. Kornacki).

On September 11, 2012, Dr. Kornacki forwarded Raulerson's e-mail from the day before containing instructions on how to reinstate the automatic payment to Mrs. Kornacki. Doc. No. 30-3 at 9. He wrote:

> hi honey, since you have the bank info can you set this up again please? [I] think the 1st payment will only be for 2 months. The letter that [I] originally got was for $700 and some odd dollars, but that was for the semiannual payment plan.

Doc. No. 30-3 at 9. Later that day or shortly thereafter, Mrs. Kornacki told Dr. Kornacki she could not reinstate the automatic EFT payment because she did not have time to do so. Doc. No. 30-4 at 3; Kornacki Depo. at 51–52. Indeed, Mrs. Kornacki acknowledges that she did not reinstate the automatic payment. Doc. No. 30-4 at 3. However, some time on or after that day, Mrs. Kornacki prepared a check in the amount of $725.42 for the purpose of paying the semiannual premium and placed it on the corner of a cabinet in her home, a location Dr. Kornacki checked daily. Doc. No. 30-4 at 4–5; Kornacki Depo. at 55–63. Mrs. Kornacki did not tender the check or do anything else with it before Dr.

Kornacki's death, explaining, "Dr. Kornacki already advised that $725.00 was not in his budget." Doc. No. 30-4 at 5; see also Kornacki Depo. at 63.

Mrs. Kornacki contends that, at some point in mid-September 2012, Dr. Kornacki delivered a check from his business, Kornacki Chiropractic, Inc., intended as payment toward the premium to Raulerson's office. Response at 2, 4, 8–9. She relies on affidavits and deposition testimony from Debra Rochester and Dana Bell, two employees at the Callahan office where Raulerson worked. Response at 8–9. Both averred and testified that they saw a business-size check with Dr. Kornacki's name on it attached to Dr. Kornacki's file on Raulerson's desk. Doc. No. 33-11 at 3, 5; Rochester Depo. at 31, 35–38; Bell Depo. at 37–43, 45. Neither could remember the exact date on which they saw the check, but both estimated it was one or two weeks before Dr. Kornacki's death.[5] Doc. No. 33-11 at 3–5; Rochester Depo. at 35; Bell Depo. at 38, 43. Neither could remember the amount on the check. Doc. No. 33-11 at 3; Rochester Depo. at 36–37; Bell Depo. at 39, 45. SFBLIC contends Dr. Kornacki never submitted any check to Raulerson either directly or indirectly, Motion at 9, 18, relying on Raulerson's testimony that he never received or saw any check, Raulerson Depo. at 98.

SFBLIC did not receive any payment for Dr. Kornacki's semiannual premium due August 24, 2012, at its Home Office. See Motion ¶ 18; Response at 4.[6] Due to the

---

[5] Rochester testified during her deposition that she thought she might have seen the check in August but ultimately confirmed she could not remember the exact date. Rochester Depo. at 35.

[6] SFBLIC cites the Rule 30(b)(6) deposition of Barbara Sanders for this fact, see Motion ¶ 18, but did not file that deposition with the Court. Nevertheless, the fact is undisputed; SFBLIC identified the fact that the semiannual premium due August 24, 2012, was never paid at the Home Office as undisputed, see Motion ¶ 18, and Mrs. Kornacki neither objected to this fact in identifying disputed facts nor pointed to any evidence suggesting that SFBLIC received a check for payment at its Home Office, see Response at 4.

apparent failure of payment before the grace period ended on September 24, 2012, SFBLIC declared the Policy to have lapsed.[7] See Doc. No. 33-12 at 2.

Dr. Kornacki committed suicide on September 26, 2012. Woehrle Depo. at 30. Shortly after his death, his daughter, Jennifer Sheffield, discovered the premium check Mrs. Kornacki had written earlier that month at Mrs. Kornacki's house and gave it to Woehrle to determine whether anything remained unpaid. Sheffield Depo. at 38–42; Woehrle Depo. at 18–19. The next day, Woehrle brought the check to a Farm Bureau function and attempted to give it to Raulerson. Raulerson Depo. at 111–13; Woehrle Depo. at 17–20, 23–24. However, Raulerson refused to accept the check. Raulerson Depo. at 111–13; Woehrle Depo. at 24–26. Woehrle returned the check to Mrs. Kornacki's father, and Mrs. Kornacki later shredded it. Kornacki Depo. at 58–59; Woehrle Depo. at 27–28; Doc. No. 30-4 at 5.

Mrs. Kornacki filed a claim with SFBLIC under the Policy, but SFBLIC denied the claim on October 1, 2012, explaining that the Policy had lapsed. Doc. No. 5 ¶¶ 21, 22 (Amended Complaint); Doc. No. 7 ¶¶ 21, 22 (Answer). Mrs. Kornacki then filed this lawsuit on July 7, 2014, alleging SFBLIC breached the Policy by denying her claim for benefits. See generally Amended Complaint. On August 4, 2014, SFBLIC's counsel sent a letter to Mrs. Kornacki's counsel responding to a Civil Remedy Notice of Insurer Violation Mrs. Kornacki had filed earlier. Doc. No. 20-3. The letter stated:

---

[7] Mrs. Kornacki disputes that the Policy lapsed because she contends Dr. Kornacki's automatic payment was involuntarily cancelled and/or he tendered payment for the premium before the date of lapse. See Doc. No. 30-2 at 2–3; see generally Doc. No. 33. It is undisputed, however, that payment was due on August 24, 2012, and that the Policy provided a 31-day grace period for curing a late payment, after which the Policy would lapse absent payment. See Doc. No. 30-2 at 1–2. It therefore is undisputed that, without payment, the Policy would have lapsed on September 24, 2012. Because SFBLIC did not receive any premium payment on or before that date, it considered the Policy to have lapsed, which explains its denial of Mrs. Kornacki's claim on the Policy. See Doc. No. 5 ¶ 22; Doc. No. 7 ¶ 22.

> The very next day, August 14, 2012, Raulerson responded to Dr. Kornacki's e-mail and requested a time to meet. In the meantime, Raulerson placed a call to SFBLIC wherein he requested the premium be placed on semi-annual mode so as to alleviate Dr. Kornacki's concerns.

Doc. No. 20-3 at 2. On August 6, 2014, SFBLIC answered the Amended Complaint. See Answer. On March 25, 2015, SFBLIC filed a Motion in Limine to Exclude Testimony and Expert Reports of Plaintiff's Expert Witnesses and Incorporated Memorandum of Law under Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), Doc. No. 15 (Daubert Motion), seeking to exclude testimony and expert reports of Mrs. Kornacki's expert witnesses, which Mrs. Kornacki opposes, Doc. No. 20.[8] On June 11, 2015, it filed the instant Motion.

---

[8] Although filed before SFBLIC's Motion for summary judgment, the Court does not address SFBLIC's Daubert Motion because the opinions offered by Mrs. Kornacki's expert witnesses are irrelevant to the Court's decision. She offers two expert witnesses: (1) Arthur Finkle, a former life-insurance agent who opined that Raulerson was a "captive agent" of SFBLIC, rather than an independent contractor, and that Raulerson's actions fell short of the standard of care expected of an insurance agent, see Doc. No. 15-1; and (2) Dr. Allen Singer, a psychiatrist who opined on Dr. Kornacki's mental state as of August and September 2012 based on Dr. Kornacki's e-mail correspondence with Raulerson. See Doc. No. 15-4.

Dr. Singer's opinion that Dr. Kornacki "was not suffering from a mental disorder such that he was rendered incapable of attending to the payments in question," see Doc. No. 15-4 at 1, is irrelevant because, as discussed infra at 22–24, Mrs. Kornacki cites to no evidence suggesting Dr. Kornacki actually paid the amount required in order to avoid a lapse in the Policy. As to Mr. Finkle, the Court first notes that Mrs. Kornacki does not rely on Mr. Finkle's opinions in either her Response or Surreply, see generally Response and Surreply; cf. Rule 56(c)(3) (stating that court reviewing motion for summary judgment only needs to consider cited materials). As such, the Court need not consider this evidence. Nevertheless, the Court in an abundance of caution has reviewed Mr. Finkle's proposed opinion. Without determining their admissibility under Daubert, the Court finds that Mr. Finkle's opinions even if considered would have no impact on the resolution of this action. Mr. Finkle's opinion that Raulerson was a "captive agent" of SFBLIC such that his actions could be imputed to SFBLIC, see Doc. No. 15-1 at 3–5, is similarly irrelevant because, as discussed infra at Note 13, the Policy put Dr. Kornacki on notice of the limits of Raulerson's authority to bind SFBLIC, whether as a captive agent or an independent contractor. Finally, Mr. Finkle's opinions that Raulerson breached the standard of care of an insurance agent by (1) failing to receive written authorization to change Dr. Kornacki's mode of payment, (2) failing to inform Dr. Kornacki that a semiannual premium notice would be sent to him after that change, (3) failing to reinstate the automatic payment, (4) failing to remind Dr. Kornacki that his policy would lapse if he did not pay the premium, and (5) failing to notify Dr. Kornacki that he could not accept the premium-payment check, see Doc. No. 15-1 at 1–3, are also irrelevant. First, as discussed infra at 19–21, nothing in the Policy required Raulerson to obtain written authorization before cancelling the automatic EFT payment at Dr. Kornacki's direction. Second, Mrs. Kornacki cites to no evidence that Raulerson's alleged failure to inform Dr. Kornacki that he would receive a Notice of Premium Due had anything to do with the lapse of the Policy in light of uncontroverted evidence that Dr. Kornacki received the notice, knew the amount due, knew the due date, and knew that he could reinstate the monthly payment with a phone call. See Doc. No. 30-2 at 1; Raulerson E-mails at 4. Third, as

## II.    Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[9] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the nonmovant. See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

---

discussed infra at Note 15, Mrs. Kornacki cites to no evidence that Dr. Kornacki actually asked Raulerson to reinstate the automatic EFT payment, and, indeed, Dr. Kornacki's e-mail to Mrs. Kornacki suggests he did not expect Raulerson to do it. Fourth, as discussed infra at Note 15, Mrs. Kornacki has cited no authority imposing an independent duty on Raulerson or SFBLIC to notify Dr. Kornacki of the impending lapse. And fifth, as discussed infra at Note 13, assuming Dr. Kornacki had delivered partial payment to Raulerson's office, Raulerson's failure to follow up cannot bind SFBLIC because Dr. Kornacki was on notice that Raulerson could not accept partial payment.

[9] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amendments.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. Thus, case law construing the former Rule 56 standard of review remains viable and is applicable here.

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Where the nonmoving party has failed to make a sufficient showing 'to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' there exist no genuine issues of material fact." Mize, 93 F.3d at 742 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

## III.   Discussion

### A.   Evidentiary Objections

Mrs. Kornacki objects to SFBLIC's reliance on Raulerson's testimony concerning the alleged telephone conversation he had with Dr. Kornacki in which Dr. Kornacki purportedly told Raulerson to cancel the automatic EFT payment, contending that

testimony is inadmissible hearsay.[10] Response at 2, 11. SFBLIC does not respond to that contention in its Reply. See generally Reply. However, SFBLIC does contend the Court should not consider its counsel's response to the Civil Remedy Notice or Rochester's and Bell's affidavits. See Reply at 2–5. Mrs. Kornacki responds that the response to the Civil Remedy Notice is relevant evidence, and SFBLIC's objections to the affidavits go to the affiants' credibility rather than the affidavits' admissibility and so do not provide grounds for the Court to reject them at the summary-judgment stage. Surreply at 4–6.

In deciding a motion for summary judgment, a court "may consider only that evidence which can be reduced to an admissible form." Rowell v. BellSouth Corp., 433 F.3d 794, 800 (11th Cir. 2005). "The general rule is that inadmissible hearsay cannot be considered on a motion for summary judgment." Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir.1999) (internal quotation marks and footnote omitted). Hearsay is an out-of-court statement offered "to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Nevertheless, "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form," Macuba, 193 F.3d at 1323 (internal quotation marks omitted).  In other words, the statement must be admissible at trial for some purpose "because it falls within an exception to the hearsay rule,[ ] or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted),[ ] or is used solely for impeachment purposes." Id. at 1323–24. The burden lies with the proponent of the evidence to "show that the material is admissible as presented or to explain the

---

[10] Mrs. Kornacki also recently filed a motion in limine asking the Court to preclude SFBLIC from using Raulerson's testimony on that issue at trial. Doc. No. 47 at 3–5.

admissible form that is anticipated." <u>See</u> Rule 56, Advisory Committee Notes to 2010 Amendments, Subdivision (c)(2).

Mrs. Kornacki argues that Raulerson's testimony about his alleged conversation with Dr. Kornacki is hearsay and should be excluded because Dr. Kornacki is unavailable to rebut that testimony. Response at 2, 11. But Dr. Kornacki's instruction to Raulerson is not hearsay because it is not offered to prove the truth of any matter asserted in the statement.  Rather, it is offered only to show that Dr. Kornacki actually made the statement and its effect on Raulerson (causing him to cancel the automatic payment). <u>See</u> <u>Anderson v. United States</u>, 417 U.S. 211, 220 n.8 (1974) ("Of course, evidence is not hearsay when it is used only to prove that a prior statement was made and not to prove the truth of the statement."); <u>United States v. Trujillo</u>, 561 F. App'x 840, 842 (11th Cir. 2014) ("Generally, an out-of-court statement admitted to show its effect on the listener is not hearsay.") Indeed, the Advisory Committee Notes to the 1972 revision to Rule 801(c), Federal Rules of Evidence explain: "If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."  As such, Raulerson's testimony that Dr. Kornacki told him to cancel the automatic EFT payment is not hearsay, so the Court will consider it in ruling on SFBLIC's Motion.[11]

The Court does not address whether the response to the Civil Remedy Notice is admissible because, as explained <u>infra</u>, it fails to create a genuine dispute as to a material fact. Thus, whether it is admissible is immaterial. Likewise, the Court declines to strike

---

[11] Raulerson's testimony about what Dr. Kornacki had told him was the reason for cancelling the payment (financial troubles), <u>see</u> Raulerson Depo. at 76–79, is likewise admissible because it is not offered for the truth of the matter asserted. It is relevant only to show that Dr. Kornacki believed he was unable to make the premium payment, not that he actually was unable to do so.

-14-

the affidavits of Rochester and Bell because, as explained infra, although their statements and testimony would create a genuine dispute as to whether Dr. Kornacki delivered a check to Raulerson's office, that factual conflict does not create a genuine issue of fact for trial.

### B.    Mrs. Kornacki's Claims

"A cause of action for breach of contract brought by a third party beneficiary must include the following allegations: 1) the existence of a contract, 2) clear and manifest intent of the contracting parties that the contract primarily and directly benefit the third party, 3) breach of the contract by a contracting party, and 4) damages to the third party resulting from the breach." Biscayne Inv. Grp., Ltd. v. Guarantee Mgmt. Servs., Inc., 903 So.2d 251, 254 (Fla. 3d DCA 2005); see also, e.g., Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd., 647 So.2d 1028, 1031 (Fla. 4th DCA 1994).

In the Complaint, Mrs. Kornacki alleges SFBLIC breached its Policy by wrongfully denying life-insurance benefits to her following Dr. Kornacki's death. Amended Complaint ¶ 1. SFBLIC responds that Dr. Kornacki failed to pay the premium by the due date or within the Policy's grace period, so the Policy lapsed, relieving it of any obligation to pay. Answer at 4–7; see generally Motion. The parties' disputes can be distilled to two issues: (1) whether Raulerson's cancellation of Dr. Kornacki's automatic EFT payment was authorized and effective; and (2) if it was, whether Dr. Kornacki cured his failure to timely pay the premium caused by that cancellation. See Motion at 11–25; Response at 10–20.

### 1.    Cancellation of Automatic EFT Payment

SFBLIC contends it is undisputed that Raulerson had Dr. Kornacki's prior approval to cancel the automatic EFT payment. Motion at 4. In Response, Mrs. Kornacki argues

that a genuine dispute exists as to whether Dr. Kornacki verbally authorized Raulerson to cancel the automatic EFT payment. Response at 11–12. She asserts the only evidence a phone call ever occurred is Raulerson's "self-protective" testimony, which is inconsistent with Dr. Kornacki's long-standing practice of using the automatic payment method, SFBLIC's counsel's letter responding to Mrs. Kornacki's Civil Remedy Notice omitting reference to any telephone call prior to Raulerson cancelling automatic payment, Dr. Kornacki's deposit of sufficient funds in the account before the EFT likely would have occurred, and the availability of means other than cancellation of the automatic EFT payment (such as moving the scheduled transfer date to the premium due date) to address Dr. Kornacki's concerns. Response at 11–12. She further asserts that SFBLIC produced no telephone records to corroborate Raulerson's account. Response at 11. SFBLIC contends that Raulerson's testimony is uncontroverted and is consistent with the negative balance in the account linked to the automatic EFT payment at the time of the alleged phone conversation and Dr. Kornacki's apparent lack of confusion in subsequent e-mails as to why the automatic EFT was no longer in place. SFBLIC further asserts that its counsel's letter responding to the Civil Remedy Notice is inadmissible and in any event does not suggest that no phone conversation occurred. Motion at 13–14; Reply at 2–3.

There is no genuine dispute as to whether Dr. Kornacki verbally authorized Raulerson to cancel the automatic EFT payment. Raulerson unequivocally testified he spoke to Dr. Kornacki, who directed him to cancel the automatic payment due to financial troubles. Raulerson Depo. at 76–79. The Court is mindful of Mrs. Kornacki's concerns that Raulerson's testimony is self-serving and cannot be directly rebutted because the only other party to the alleged conversation—Dr. Kornacki—is dead. See Response at 2,

11; Surreply at 3–4 & n.1. However, the mere fact that the evidence is self-serving does not permit the Court to disregard it; "the law allows that interest and truth may go together." Feliciano v. City of Miami Beach, 707 F.3d 1244, 1253 (11th Cir. 2013) (internal quotation marks and alterations omitted). Although a court need not entertain self-serving testimony that is conclusory or not based on personal knowledge, see id. at 1252–53, Raulerson's testimony is based on his personal knowledge and is not conclusory, as it describes in detail his conversation with Dr. Kornacki in which Dr. Kornacki instructed him to cancel the automatic payment. See Raulerson Depo. at 76–79.

Moreover, the circumstantial evidence surrounding the cancellation does not call into question Raulerson's account of the events. Cf. Cruz v. City of Anaheim, 765 F.3d 1076, 1079 (9th Cir. 2014) (cited by Mrs. Kornacki; holding that, in context of civil-rights claim based on deadly force, court "must carefully examine all the evidence in the record to determine whether the officer's story is internally consistent and consistent with other known facts," including "circumstantial evidence that, if believed, would tend to discredit the police officer's story" (internal quotation marks and alterations omitted)). As SFBLIC observes, the apparent lack of confusion by Dr. Kornacki as to why the automatic EFT payment had been cancelled when he e-mailed Raulerson on September 7, 2012, about the August 24, 2012, notice he had received and the bank statements showing that Dr. Kornacki's bank account did not have sufficient funds to cover the premium payment at the time of the alleged phone call are consistent with Raulerson's testimony. Additionally, the transcript of Raulerson's phone call cancelling the automatic EFT payment is consistent with his testimony because, during that call, he explained that Dr. Kornacki "was w[o]ndering if we could suspend his draft and he's gonna want[ ] to pick it up you

know in maybe a week or two later." Doc. No. 20-2 at 2. And Mrs. Kornacki points to no evidence suggesting that Raulerson would have had any reason to cancel the automatic payment but for the direction from Dr. Kornacki. See Raulerson E-mails at 3 ("I also need to speak with you tomorrow regarding my upcoming premium payment scheduled for what I think is the 18th of August.").

To support her argument that other evidence undermines Raulerson's version of the events, Mrs. Kornacki points to SFBLIC's counsel's letter responding to the Civil Remedy Notice, her own belief that Dr. Kornacki would not have authorized cancellation of automatic payment, and the later deposit of sufficient funds that would have covered the automatic withdrawal. Response at 11–12. While the Court questions whether counsel's statement in response to the Civil Remedy Notice constitutes admissible evidence, even if it does, it fails to create a genuine issue of fact for trial. The letter states only that Raulerson cancelled the automatic payment before meeting with Dr. Kornacki; it says nothing about any phone call one way or the other. See Doc. No. 20-3 at 2. The omission of any mention of a phone call is insufficient to counter the uncontroverted affirmative testimony of Raulerson, which is consistent with all of the circumstantial evidence. In addition, Mrs. Kornacki's speculation in her Response that Dr. Kornacki would not have cancelled the payment is not evidence, is unfounded, and fails to consider the circumstances at the time, including the lack of sufficient funds in the bank account linked to the payment. See Foster v. Biolife Plasma Servs., LP, 566 F. App'x 808, 811 (11th Cir. 2014) (citing Rule 56(c)(4), stating that speculative testimony not based on personal knowledge is insufficient to oppose a motion for summary judgment); Riley v. Univ. of Ala. Health Servs. Found., P.C., 990 F. Supp. 2d 1177, 1187 (N.D. Ala. 2014)

("A party's mere belief and/or speculation is not based on personal knowledge and is not competent summary judgment evidence." (internal quotation marks omitted)). Finally, the later deposit of sufficient funds in time to make the automatic payment as originally scheduled is irrelevant because it occurred after the conversation and EFT cancellation. Bank records show that, at the time Dr. Kornacki communicated with Raulerson and when Raulerson cancelled the payment, the account linked to the payment had a negative balance. Kornacki Depo. at 134. That Dr. Kornacki actually deposited sufficient money to cover the premium payment before its withdrawal date makes no difference because, according to Raulerson's uncontroverted testimony, Dr. Kornacki was unsure of when he would receive that money. See Raulerson Depo. at 76, 78. Although Mrs. Kornacki speculates that Raulerson could have moved the transfer date rather than cancel it altogether, there is no evidence that either Raulerson or Dr. Kornacki considered that alternative.

In consideration of the record as a whole, Mrs. Kornacki has not provided more than "a mere scintilla" of evidence refuting Raulerson's testimony that Dr. Kornacki verbally directed him to cancel the automatic EFT payment. As such, there is no genuine dispute as to that fact.

Perhaps recognizing the lack of evidence to refute SFBLIC's assertion that Dr. Kornacki directed the cancellation of the EFT payments, Mrs. Kornacki argues that, even if Dr. Kornacki had verbally authorized Raulerson to cancel the payment, that authorization was insufficient because the Authorization Agreement required any such cancellation to be in writing. Response at 7, 11; Surreply at 2. SFBLIC responds that language on which Mrs. Kornacki relies is directed to the bank, not to SFBLIC. Reply at

1–2. Mrs. Kornacki counters that a jury could reasonably agree with her interpretation of the language. Surreply at 1–2.

Upon review, the Court concludes that the language from the Authorization Agreement to which Mrs. Kornacki cites is directed to the bank, not SFBLIC. It is within a separate box, the top of which reads "Authorization to Honor ACH Debit Entries or Drafts Drawn by [SFBLIC]" and is addressed to "Wells Fargo." Doc. No. 33-13 at 5. Mrs. Kornacki's attempts to create a dispute as to the import of this language are unavailing. She offers only the testimony of SFBLIC's corporate representative Laura Humphries in which Humphries agreed with Mrs. Kornacki's counsel that the language could be read as indicating that a cancellation of the automatic payment would have to be in writing. Surreply at 2 (citing Humphries Depo. at 28–29).[12] However, the context of the testimony makes clear that Humphries had no prior familiarity with that language in the form. See Humphries Depo. at 27–29. Indeed, she specifically testified that company policy did not require an insured to cancel automatic payments in writing. Humphries Depo. at 25. More importantly, that testimony is insufficient to counter the unambiguous language on the

---

[12]   Q.   At least to my eyes, that has relevance to the agent's authority to make a phone call to change a premium mode when the insured has not, in written form, revoked the bank draft. Does it to you? …

A.   Right. It does say that.

Q.   … Well, what's it mean?

A.   Based on what—that one statement, it says that it—unless revoked by the client in writing, that the drafts and the authorization stand true.

Q.   So if I'm an agent at Southern Farm and I have a client call up and say, ["]I have got some kind of financial question; I want to change the premium mode or stall,["] or whatever an agent hears from the insured, the agent should say, "Happy to do that, but you have to revoke it in writing because it says so in the contract"; right? …

A.   Correct, that's what it says.

Humphries Depo. at 27–29.

form itself. The language of the Authorization Agreement is unequivocally directed to Wells Fargo, and authorizes Wells Fargo to pay drafts drawn on Dr. Kornacki's account by SFBLIC. See Doc. No. 33-13 at 5. It does not in any way address the manner in which Dr. Kornacki must communicate with SFBLIC about initiating or cancelling drafts from the account. In accordance with the Authorization Agreement, so long as SFBLIC initiated a draft from Dr. Kornacki's account, Wells Fargo was bound to honor the draft absent written revocation. But SFBLIC was not bound to initiate the draft. Indeed, SFBLIC discontinued the draft based on Dr. Kornacki's instruction; thus, the language of the Authorization Agreement does nothing to support Mrs. Kornacki's claim. In any event, even if the form did contemplate cancellation in writing, that Dr. Kornacki verbally authorized the cancellation and that SFBLIC accepted that authorization would constitute a waiver by both Dr. Kornacki and SFBLIC of any such requirement.

The undisputed evidence establishes that Raulerson properly cancelled the automatic EFT payment of Dr. Kornacki's premium at his direction. Following that cancellation, SFBLIC mailed Dr. Kornacki a notice instructing him to pay the semiannual premium amount of $725.42. Doc. No. 30-1 at 4; Kornacki Depo. at 93. It is undisputed that his payment of this amount was due on August 24, 2012, that the policy provided a 31-day grace period such that he could maintain coverage if he paid the premium by September 24, 2012, and that he did not tender any payment directly to SFBLIC's Home Office by that date. See Doc. No. 30-2 at 1–2; Motion ¶ 18; Response at 4. In light of those facts, SFBLIC did not breach the Policy on its face because Dr. Kornacki did not tender conforming payment of the premium by the end of the grace period, so the policy lapsed before Dr. Kornacki died. Nevertheless, Mrs. Kornacki contends that (1) Dr.

Kornacki tendered payment at Raulerson's office in Callahan, and (2) SFBLIC waived or is estopped from relying on the Policy provision requiring payment at its Home Office in Mississippi.

### 2.    Tender of Premium to Raulerson's Office

SFBLIC contends it is undisputed that Dr. Kornacki never paid the semiannual premium at its Home Office and that there is no evidence of any tendered premium check. Motion at 6, 8. Mrs. Kornacki responds that a genuine dispute exists as to whether Dr. Kornacki tendered payment to Raulerson at his office in Callahan. Response at 12–14. She acknowledges that Raulerson denies ever receiving a check from Dr. Kornacki but points to affidavits from Rochester and Bell in which they state that they saw a check with Dr. Kornacki's name on it on Raulerson's desk at some point shortly before Dr. Kornacki's death. Id. at 8, 12–13. SFBLIC contends no genuine issue exists as to that fact because neither Rochester nor Bell could recall the date they saw the check or its amount. Motion at 9. It further contends the Court should not consider their affidavits because they are inconsistent with their deposition testimony and state facts about which they have no personal knowledge. Reply at 3–5.

A genuine dispute exists as to whether Dr. Kornacki tendered a check at Raulerson's office. Raulerson testified he never received or saw any premium check from Dr. Kornacki. Raulerson Depo. at 98. But Rochester and Bell testified and averred they saw a business check from Dr. Kornacki on Raulerson's desk one or two weeks before Dr. Kornacki's death. Rochester Depo. at 31, 35–38; Bell Depo. at 37–43, 45; Doc. No. 33-11 at 3–5. Which account is more credible (or, indeed, whether the accounts can be reconciled) is a jury question.

However, that disputed fact is not material. Mrs. Kornacki cites to no evidence suggesting the amount of the check. Dr. Kornacki owed $725.42 by virtue of the cancellation of his automatic monthly payment, as indicated on the August 24, 2012, Notice of Premium Due. See Doc. No. 30-1 at 4. There is no basis for a jury to infer that the check was for that amount. Indeed, any such inference would be unreasonable in light of the evidence that (1) on September 7, 2012, despite having deposited $23,500 in his account three weeks earlier, Dr. Kornacki stated and believed that $725.42 was not in his budget and wanted to pay only two months' premium, see Raulerson E-mails at 4, and (2) on September 11, 2012, Dr. Kornacki asked Mrs. Kornacki to reestablish the automatic EFT payment and indicated to her he expected the first automatic payment to be for two months, see Doc. No. 30-3 at 9. The record evidence reflects only Dr. Kornacki's belief that he could not afford to pay the full premium and his intent to pay some lesser amount. Assuming that, consistent with that intent, Dr. Kornacki tendered a partial payment and SFBLIC had waived (or is estopped from relying on) the requirement that payment be made at its Home Office, the partial payment would not have been sufficient to reinstate the policy. This is so because, Mrs. Kornacki acknowledges, the Notice of Premium Due required him to pay the full semiannual premium to maintain coverage.[13] Doc. No. 30-1

---

[13] Moreover, Raulerson's alleged receipt of Dr. Kornacki's check and failure to do anything with it would not constitute waiver of SFBLIC's requirement of and right to full payment because—even assuming Dr. Kornacki had relied on the lack of any follow-up from Raulerson as an indication that his partial payment had been accepted—the Application and Policy together put Dr. Kornacki on notice that Raulerson did not have authority to modify the Policy or waive any of SFBLIC's requirements or rights, which would include payment in full of the premium due. See Woehrle Depo. at 156; Policy at 5, 8; cf. Brown v. Inter-Ocean Ins. Co., 438 F. Supp. 951, 954 (N.D. Ga. 1977) (applying Florida law; stating that agent's acts bind insurer unless insured knew of limitations on agent's actual authority or circumstances put him on notice to inquire about scope of authority); Fid. & Cas. Co. of N.Y. v. D.N. Morrison Constr. Co., 156 So. 385, 387 (Fla. 1934) (same); Hughes v. Pierce, 141 So. 2d 280, 282–83 (Fla. 1st DCA 1961) (same). Mrs. Kornacki presents no evidence that Dr. Kornacki was ever led to believe SFBLIC would accept less than the full premium due or that Raulerson was authorized to waive the requirement of full payment, and the uncontroverted evidence shows Raulerson told Dr. Kornacki he could pay two months' premiums by

at 4; Doc. No. 30-2 at 1. And it is undisputed that in order to pay any less sum than the semiannual premium amount the Policy required Dr. Kornacki to reestablish the monthly bank draft or some other form of preauthorized payment, which he did not do. Doc. No. 38-5 (schedule page of Policy stating that monthly premium amount "is applicable if premiums are payable by monthly pre-authorized payment" and that termination of preauthorized payment would cause method of payment to automatically change to annual); see also Woehrle Depo. at 153 (providing as options for method of payment annual, semiannual, single, or specific modes of monthly payment). Mrs. Kornacki points to no evidence of any other attempted payment before Dr. Kornacki's death.[14] Because there is no evidence suggesting that Dr. Kornacki tendered full payment as required to maintain the policy in force, Mrs. Kornacki is unable to establish an element essential to her breach-of-contract claim (the existence of a contract and/or breach of a contract). SFBLIC therefore is entitled to summary judgment as to Count I of Mrs. Kornacki's Amended Complaint. Because Dr. Kornacki's alleged payment would have been insufficient to maintain the Policy in force, whether SFBLIC had waived or is estopped from relying on the Policy provision regarding the location of payment is immaterial.[15] SFBLIC is entitled to summary judgment as to Count II as well.

---

reinstating the automatic EFT payment, not by tendering a check to Raulerson's office. See Raulerson E-mails at 4.

[14] Although Mrs. Kornacki had prepared a check for the full amount due at some point, she admits she never tendered it because "Dr. Kornacki already advised that $725.00 was not in his budget." Doc. No. 30-4 at 5. She later destroyed it. Id.

[15] In her Response, Mrs. Kornacki focuses her waiver/estoppel argument on whether SFBLIC waived or is estopped from relying on the Policy provision requiring payment directly to the Home Office based on a past course of conduct allowing nonconforming methods of payment. See Response at 17–20. That approach differs from that of Count II of her Amended Complaint, in which Mrs. Kornacki bases her claim of waiver/estoppel on Raulerson's alleged wrongful termination of the automatic EFT payment, failure to honor Dr. Kornacki's requests to "get the Policy current" and reinstate the automatic EFT payment, and representation that he could collect premiums on SFBLIC's behalf. See Amended Complaint ¶¶ 31–39. Mrs. Kornacki has presented no evidence that Dr. Kornacki affirmatively instructed Raulerson to reinstate

## IV.    Conclusion

In light of the foregoing, SFBLIC's Motion is due to be granted in its entirety.

Accordingly, it is hereby

**ORDERED:**

1.    Defendant Southern Farm Bureau Life Insurance Company's Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. No. 21) is **GRANTED**.

2.    The Clerk of the Court is directed to enter **JUDGMENT** in favor of SFBLIC and against Mrs. Kornacki.

3.    The Clerk of the Court is further directed to terminate all remaining pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** in Jacksonville, Florida, this 23rd day of October, 2015.

MARCIA MORALES HOWARD
United States District Judge

lc21

Copies to counsel of record

---

the automatic EFT payment; indeed, Dr. Kornacki's e-mail to Mrs. Kornacki asking her to reinstate the payment in accordance with Raulerson's instructions, see Doc. No. 30-3 at 9, is inconsistent with any inference that he had intended Raulerson to do it. Mrs. Kornacki also has presented no evidence that Raulerson ever represented to Dr. Kornacki that he could accept premium payments on SFBLIC's behalf. As such, even if Mrs. Kornacki had continued to pursue those arguments in her Response, they fail.

Although not raised in Mrs. Kornacki's Response or Surreply, one other argument suggested in Mrs. Kornacki's Amended Complaint warrants some discussion. She suggests Raulerson should have notified Dr. Kornacki that his Policy was set to lapse. See Amended Complaint ¶¶ 20, 34–37. But SFBLIC correctly observes that the Policy includes no such notice requirement, see Motion at 6; see generally Policy, and Mrs. Kornacki fails to provide any authority independently imposing a duty to provide notice of a lapse. Cf. Ayodele v. Primerica Life Ins. Co., No. 09-21267-CIV, 2010 WL 3743814, at *4 (S.D. Fla. Sept. 22, 2010) (unpublished) (stating that Florida law does not impose duty to notify insured of lapse in coverage unless insured is older than 64, citing Fla. Stat. § 627.4555).